Good morning, ladies and gentlemen. Our first case for argument this morning is 4SEMO against Southern Illinois Storm Shelter. Mr. Churich. May it please the court, my name is Doug Churich, I'm with the law firm of Sandburg Phoenix, Montgomery and St. Louis, I, along with my co-counsel, Tim Sansone, are here on behalf of Southern Illinois Storm Shelters, Englesby Excavating, and Bob Englesby. Your Honor, this case involves some very small, relatively small companies that had a very dispute among themselves, based in large part upon the fact the relationship was a dealer-manufacturer relationship. My client, Southern Illinois Storm Shelters, the manufacturer of these storm shelters agreed for the appellee, 4SEMO, to assume their dealership and to market and sell their storm shelters in a very limited zone of territory in Southern Missouri and Northern Arkansas. In doing so, they were very limited in what they could and couldn't do, where they could and couldn't sell, and the parties, even if it was decided that the... I'm not sure why you say they were limited in what they could, in where they could sell. They could sell storm shelters anywhere in the world, so far as I could see, although they could sell Southern Illinois Storm Shelters only in particular areas. Yes, Your Honor. Is that correct? And the trademarks in dispute here are marks that were used by the parties on the Southern Illinois Storm Shelters. Any reason why 4SEMO couldn't have used them on anybody's storm shelters? That issue was not raised below... Is there any reason why they could not have used it on other suppliers' storm shelters? Well, because if you follow the McCarthy test and apply the proper... I'm not asking about the McCarthy test. Is there any reason? Is there contract promise? Well, if our client is found to be the owner of the mark, then they would not have the right to use the mark other than... If your client is the owner of the mark. Correct. If your client is not the owner of the mark, is there any reason why they couldn't have used it on somebody else's storm shelters in Alaska? There's no understanding agreement with the parties that would preclude them from doing so, Your Honor. Okay. Thank you. Sure. However, the ownership is a key factor in this case because our client's Southern Illinois Storm Shelter was the manufacturer and the application of the McCarthy test to these facts is outlined in great detail. So far as I know, this Mr. McCarthy has never written a majority opinion for the Supreme Court, has he? He has not, Your Honor. Then you might want to make an argument about why we should pay any attention to a statement in a treatise. Well, Your Honor, this court has already recognized the McCarthy test. I wish you would stop referring to the McCarthy test. There is no such thing. There are decisions of courts, preferably the Supreme Court. What Professor McCarthy suggested was that this would be a presumption, a starting place, right? That's what his treatise says. Well, what McCarthy talks about in his treatise is the unique relationship between a manufacturer and distributor, and the fact that these parties oftentimes have unusual relationships with each other. So it's being offered by an academic as a starting place. That's a good place to start. That's fine. But that's not where the district court stopped. As is usual with starting places in the law, more evidence can take you someplace else. You might want to deal with the actual findings in this case. Well, Your Honor, the findings in this case were dealt with in our brief in which we identified all the factors that play it out against the McCarthy test under this rationale, indicating that the ownership of the wardmark falls in place to Southern Illinois Storm Shelters. This court in TMT North America... Please, please be careful that you don't touch the microphone. Recognizing this test, McCarthy test, and recognize these factors should be applied where the initial allocation of trademark rights is in dispute. That's exactly what we have in this case. The initial allocation of trademark rights are in dispute. There was no written agreement among the parties allocating the trademark rights. There was evidence in the record of use of the wordmark prior to the appellees for CMO assuming a distributorship from Southern Illinois Storm Shelter. Excuse me. And so by this court's own recognition of those types of factors, it says these are the types of factors that should be used when there's no initial allocation of rights. And that's exactly what McCarthy talks about in his treatise, Your Honor. There was an oral agreement, wasn't there? As to... There was an oral agreement not with regard to the trademarks. There was an oral agreement with regard to distributorship. Subsequently, after the distributorship was established, the parties entered into an agreement with regard to the trademarks, but then that was terminated. And this court, the... Excuse me. Any licensee estoppel that might have applied under that agreement terminated with the termination of the agreement. Is that the oral agreement you're referring to, Your Honor? There was an agreement in February 2006 regarding the marks. That's correct, but that was already after... Not just the distributorship relationship. I'm talking about the agreement regarding the marks. Correct. That took place after... Your client asked the plaintiff for permission to affix the marks to the... Well, my client asked for permission to use the Red Cross logo, thinking that was the one that was in discussion. And they asked, can we go ahead and use the Red Cross logo? At that time, the parties entered into an agreement. They said, sure, let's go ahead and do that. You can use it in Southern Illinois. And that was an agreement after the parties had already become... Already after the parties had established their manufacturer-distributorship relationship. And as I mentioned, that agreement was subsequently terminated. And so, to the extent there might have been... Why would you have to ask permission to use the mark if you already owned it? Our clients never claimed that they designed or created the Red Cross logo. We've always taken the position that that was created by For CIMO. However, the word mark, which is a separate trademark, there's clear evidence it was in use prior to the relationship established by the parties, prior to when For CIMO even asserts that it created the mark. And our client has always taken the position and has argued vehemently that the word mark was our client's mark and did not belong to For CIMO. Are you talking here about the grown purchase? I'm talking... Well, the grown purchase was one aspect of it. Again, what we're dealing with here is our client is a manufacturer of these storm shelters. And they have a dealership network. Various of these dealers had been using different marks and different trademarks and different ways of advertising. One of them was, and this is grown, was the one you're talking about, was using the word mark that's in dispute. You made reference to the word mark. The gap, though, was nine years, though. Wasn't it between the grown use of that and the time that your client ended up making the argument that they have the word mark? No, Your Honor. Actually, the grown mark was utilized in the early 2000s. The parties began the relationship as a manufacturer and distributor in mid-2000, around 2005, that time frame. So it was only a couple years of difference there. When this became evident that there was a dispute among the parties many years later, there was an attempt, an erroneous attempt, to try to acquire the grown rights in the mark, not recognizing that the mark was already owned by our clients to begin with, by Southern Illinois Storm Shelters. You're talking about the word mark? The word mark, yes. They never have tried to claim ownership of the Red Cross. In fact, once our client recognized and found out that the Red Cross logo was illegal in use, we stopped using it. You're shifting back to the logo mark. I'm talking about the word mark. Your allegation is that your client was using the word mark in advance of the grown purchase? Yes, Your Honor. The trial court did not find that. However, our client certainly argued it and put in evidence to that effect. And the trial court found that your client was lying, basically. We found they were not credible. That's the polite legal word for lying on the stand. Well, Your Honor, there was no statement that the trial court found any particular aspect of the testimony without credibility. But yes, there was a statement that the trial court did not find our client's testimony credible. But with regard to the word mark, though, again, our client has always maintained that it owned the mark that it was being used prior to it. Again, if you look at a lot of the information and statements pertaining to the relationship between a manufacturer and a distributor, you're going to find that these kinds of things happen. There's confusion that can be generated by who owns a particular trademark between the manufacturer and the distributor. That's why the McCarthy test or this test, a series of factors is utilized to try to determine where the mark ownership begins and ends and who owns it, based upon the relationship and the actions of the various parties. In our trial brief, sorry, in our appellate brief, we go to a great extent not challenging the facts as determined by the trial court, but simply utilizing the facts as the trial court found to show that factors weigh in favor of Southern Illinois Storm Shelters as the owner of the word mark. In fact, what this court adopted with regard to those factors and with regard to the test we're talking about, there's a presumption that the manufacturer, in this case, our client, Southern Illinois Storm Shelters, was the presumptive owner and that there would have to be a burden of overcoming that presumption by showing that the factors weigh favorably against the distributor. That's not the case here. With regard to the amount of damages that have been imposed, there's been, I guess, a misunderstanding or confusion on the part of the opposing counsel with regard to what our argument is. Our argument with regard to geographical limitations is not that there should be some set off against the damages awarded by the court. What we're saying is that there was no infringement outside the geographical territory. That's where we began. There were no geographical limitations. There were limitations on where the plaintiff could sell Southern Illinois Storm Shelters, but there were no limitations on where they could sell Storm Shelters. Your Honor, they weren't selling any other Storm Shelters. That's a different question from whether there were limitations. They were not, in fact, selling them. There were no limitations. That would be one consideration. I'm interested in a different question about profits. Did anybody try to estimate how much profit the defendants made by using this mark? No, Your Honor. In fact, that's one of our concerns that the district court didn't take into consideration. Obviously, the judge wasn't going to take that into consideration if nobody produced any evidence about that. But I take it your answer means nobody hired an expert to try to evaluate the differences in sales according to how these marks were used and when people started and stopped using them. There's no such evidence in the record with regard to those questions, Your Honor. There's further no evidence in the record or no consideration by the court in the record in regard to... Whose burden do you think that would be? Is it that the plaintiff makes a prima facie case by pointing out the profits and the defendants can then say, yeah, but these profits came from the shelters, not from the mark? Or is it the plaintiff's burden as a matter of law? Well, if we're talking about set-offs, the burden would be on under 1117 to... This is not a matter of set-off. This is a matter of calculating profits. But that's the standard for calculating profits. What does Professor McCarthy say about this? Your Honor, the statute states that the 1117 states that as you just indicated... What does Professor McCarthy say about this? Your Honor, I do not have access to Professor McCarthy's statement with regard to that. However, there's two different aspects with regard to the damages. One argument is that the damages don't apply to infringements or alleged infringements that occur outside the territory in which the mark was utilized and could be used for SEMO. In which case, the damages are all strictly limited to those infringements that occurred inside that territory, which they have calculated. Their own expert calculated and said that those amounted to $26,000. All the rest, 99% of the damages are awarded based upon sales by distributors outside of the territory. So you have two levels here. First, there's sales by other parties that are being contemplated. And secondly, there's also the fact that the sales occurred outside the territory in which this common law trademark could be used and was used for SEMO. There's no evidence to show any kind of expansion of potential by For SEMO, no attempts to expand. We're talking about a 6-8 year time frame. For SEMO over that entire period of time had total sales of less than $600,000 of these storm shelters over 6-8 years. That's it. And yet the court awarded $17 million in damages. There's no appeal of the magistrate's decision or the district court's review of that decision with regard to the limit on your client's damages evidence. There's no appeal from those previous determinations by the magistrate and then by the district court limiting your client's damages case. Well, we're appealing it here, Your Honor. I'm not sure what your question is. I don't see reasoning that you're giving as to why the magistrate and the district court were incorrect with regard to the limits placed on your clients. Well, I guess, Your Honor, what we're saying is not that the limits, first of all, yes, we do disagree that the limits should not have been imposed. The problem is the court did not take the proper legal analysis with regard, the district court did not take the proper legal analysis with regard to the territoriality and geographical limitations of a common law trademark. A common law trademark is limited in scope to the southern Missouri and northern Arkansas. And the infringements, the purported infringements are, at least the damages were awarded on alleged infringements outside that territory. Those are not infringements. That's a de novo review issue for this court to consider to determine whether or not those activities outside the territory in the distributorship agreement are, in fact, infringements when they weren't. If they weren't infringements, there can be no damages assessed to them. Ninety-nine percent of the damages were awarded based upon those activities outside an area in which Forcimo could actually and actually did use the mark. Did I answer your question, Your Honor? You may continue. With regard to another aspect of the damages, and that is, and we touched on it a little bit here, the damages in very firmly in equity and sometimes the penalties, sorry, sometimes the damages can be penal in nature, other times not, depending upon the statute that they're applied by to. In this case, though, however, under equitable principles, the damages are so disproportionate to any equitable principles, they should just be reconsidered, either remanded or reconsidered and put in place to coincide with the actual types of injuries and damages associated with the activities infringement that's been alleged. In this case, what we are looking for is the court to reduce the damages to the $26,000, which is the instance of occurrences that occurred within the territory. With regard to Mr. Ingleby's, Bob Ingleby's, personal liability, the entire record is devoid of any kind of active participation by Mr. Ingleby in the activities associated with the infringements. He was not the person who did any of the activities, it was actually Scott Ingleby. Counsel, why does any of that matter? The district court found that no corporate formalities were ever observed. That's a finding that the defendant is a proprietorship and all participants in a proprietorship or a partnership are equally liable. You're not challenging the district court's findings of fact that no corporate formalities were ever observed. At least I couldn't see any such challenge. Well, Your Honor, what the district court found was that the various of the corporate formalities were not found and the court then went on to find personal liability for Bob as a conspirator under civil conspiracy. I don't believe that the record indicates that the court found that there were no formalities followed by our clients. Simply that some were not. And again, we don't challenge the factual findings below, we challenge the determination and the application of those findings to the law. Your Honor, I see that I'm just about to run out of time here. I'd like to reserve the last five minutes for rebuttal if I could. Sure. Thank you. Mr. Kramer. Thank you, Your Honor. May it please the court that Charles Kramer for the process appellant. I'd like to begin briefly by addressing one argument that was raised for the first time in the reply brief of the appellant, so it's not addressed in our briefs which is the one paragraph argument claiming that the limited license, limited use agreement that Corsimo agreed to give to the appellants was somehow a naked license. That issue was never raised in the court below. It was not ever asserted as an affirmative offense. Importantly, it was not in the amended pretrial order as a listing of issues on which this case was tried. And in addition, it wasn't even raised in their original appellant's brief. It was raised for the first time on appeal, which is this court recognized in the United States against Feinberg, found at 89 F. 3rd, 333 pages 340 through 41 is improper and should not be considered when first raised in a reply brief. Further, the limited use agreement was not a naked license. Findings of fact 74 through 78 found in the amended memorandum in order of the District Court which is in the supplemental appendix, document 41 at page 309 go through in detail the agreement that was reached and stating what its actual controls and limitations were and in fact it is that limited agreement that was mischaracterized by Mr. Juravich during his argument. The limited use agreement was not any kind of agreement from the appellants to Forcimo. It was an agreement from Forcimo to the appellants to use their mark. So to the extent that agreement was later terminated after further wrongdoing by the appellants, that did not somehow strip Forcimo of its rights. It stripped the appellants even of the limited rights they had under the limited use agreement. They mischaracterized this and flipped it out of its head in their reply brief. They did so again today in oral argument and it's important to keep that distinction clear. But in finding of fact 77, the District Court specifically found in facts that are supported by the record as referenced in our brief that the limited use agreement had four criteria. One, it was limited to a particular limited sales channel. Forcimo gave the appellants the rights only to use the mark in conjunction with retail sales and retail installations direct to the end users. It was also limited to a particular geographic area. The rights to use the marks were limited to retail sales and installations in southern Illinois. Also it was listed only to certain specific goods, only those storm shelters manufactured by the appellants. And most importantly it was limited to the fact that any and all marking materials whatsoever that used the mark had to be approved by and controlled by Forcimo and all ordering and production went through Forcimo which the record reflects all that actually happened except for the undisclosed use way outside the scope by the appellants when they decided to use it as a manufacturer's mark and encourage all their dealers nationwide to use it. It was not a naked license. It was set out with specific limitations as found by the court and in any event that whole argument was never raised either below or in the initial brief. Turning to the argument made by Mr. Cherovich and in the appellant's brief about what he calls the McCarthy test as the court noted, this is a line from a treaties which sets forth a starting point presumption but more importantly even McCarthy recognizes that this is something that he is in a relationship with an exclusive distributor. Usually when it's an international manufacturer and the exclusive distributor is the US presence who basically fills the role of the manufacturer in distributing by sales to dealers across the country nationwide. As appellants have recognized, Forcimo was never a distributor. They were a dealer. They were a retail merchant selling to end users. They were never even a distributor. They were never even exclusive. The actual contract says they were only given exclusive rights to install appellant shelters in certain areas. It didn't even limit the ability to sell appellant shelters anywhere but as this court has noted, it didn't prevent them from selling any other manufacturer's products anywhere they wanted. More importantly, even the limitation in the contract here on the installation contract was as appellants noted in their argument, limited to a handful of counties and they had a nationwide I'm worried about several aspects of the damages counsel. Were there any efforts to determine how much of the injury could be attributed to the Red Cross logo as opposed to the textual trademark? Actually your honor, Professor Hoffman's expert testimony in the record did to some degree address that issue but more importantly your honor, first of all it's not a Red Cross logo, it's a Greek Cross logo because it was initially yellow and it was used yellow and red back and forth through the whole time period. But the Greek Cross logo has the wordmark embedded in the horizontal arm. So any use of the logo was also a use of the wordmark. So therefore there was no distinction necessary. But more importantly your honor, to answer your question asked of opposing counsel in an argument as to whether or not there was any effort made to distinguish between revenues that came in from the use of the mark there actually was. The party stipulated that all of their sales of these shelters were done during the time period in reference, were sold under and pursuant to the mark. I wish you'd address my question. Then I'll get to the other questions. First question is, was there any effort to distinguish sales that might be attributed to the words from sales that might be attributed to your Greek Cross, regardless of color. And next I'll ask whether there was any effort to distinguish yellow from red. I understand your honor. The answer is not on the numerical side. There was no distinction on the damage. Try it a little louder. That microphone records but it doesn't amplify it. I'm sorry your honor. The answer was that in terms of the damage analysis by Forcimo's damage expert, there was no distinction made. The evidence however reflects, as I indicated there is no real distinction because all uses of the logo mark also used the word mark and they were sold together and inextricably. Well, that may be a problem for you if the use of the Greek Cross violates federal law. If the words were never used apart from the Greek Cross then presumably you could get damages only to the extent the Greek Cross was yellow. Your honor, I'm sorry if I was not clear. The word mark was always used separately standing alone at the same time. I thought you were saying it was never used. I am trying to figure out whether there was any effort to distinguish damages attributable to the words from damages attributable to the Greek Cross. And I'm sorry your honor, I believe I answered that. The answer was no, not in the damage analysis. And now who bears the burden on that? The defendant's appellant. Why? By statute your honor. All we were actually required to do was to come forward with gross revenues of the appellant as a whole from any product, any source. It was up to them to offer any revenues that should not be considered. However, voluntarily. You say statute. What statute are you relying on for the proposition that if there are two marks, one of which is legal and one of which is not, the plaintiff doesn't have to try to distinguish between the two? What statute says that? No statute says that as phrased your honor. So, I ask again, who has the burden? And you can't say the statute says it belongs to the defendant if you can't tell me what statute it is. If I may explain your honor with my point and I understand that there is a distinction here. If for any reason the logo mark was deemed not to be a valid mark, then sales under the logo mark would be sales without being attributed to any valid legal mark whatsoever. They would just become sales of the appellant's that would be lumped in with the improper sales made under the word mark. And who has the burden of disentangling what happens when you've got a valid mark and an invalid mark? I believe your honor, and unfortunately I don't have cut case citation to tell you, but I believe in that case your honor it then falls to the general idea that this is revenue not attributable to the mark under your hypothetical although we obviously disagree, that would be not attributable to the enforceable mark. It would then move to the defendant to bear the burden of excluding that revenue from the analysis. But you don't have any case that holds that? I don't your honor. No statute, no case. Alright. And now let me get to the second question, which you were anticipating. I gather that you agree that there was no effort to determine how much the mark contributed to the sales and profits. Correct. Who has the burden on that issue? The appellant your honor. And why? Again for the same reason your honor, to the extent... The same reason. The reason you've given me is I have no statute and I have no case. I hope you've got a better reason than that. I'm sorry I'm not being I'm sorry I'm not being clear your honor. For the same general statutory reason that any revenues that seem to be are to be excluded once the plaintiff makes their prime evasion case. Tell me what statute you're relying on. You keep mentioning statute. I ask for what statute? May I retrieve my brief your honor? Please. Thank you. Thank you. Thank you. This isn't promising. I'm sorry your honor, it's the general provision of the WAMLIFT which I'm referring which just sets out the burden of proof which indicates that it's the plaintiff's burden to come forth with general revenues and then it is by 15 U.S.C. 1117 your honor. It's just the general provision. All of it? All of it? 1117A in assessing profits the plaintiff shall be required to prove defendant sales only. Defendant must prove all elements of cost or deduction claimed. Thank you your honor. That is the statute I was referring to. Okay so 1117A is where we need to go you say? And the defendants expressly waived any opportunity to proceed under that statute? They waived the right to put forward cost deductions and then they were also sort of sanctioned to some extent although it had no impact by also being precluded from that cost information. There was nothing in the court order or in their statement of waiver that dealt with anything other than cost and they did not waive the right to pretrial to put forward any arguments of deduction of certain types or natures of revenues or sales. They just didn't do it. Right and the judge turned and so found. Right. With respect to the question asked of opposing counsel during their argument as to whether any effort was made to distinguish dollars earned from sales under the marks opposed from other sales actually although not required to under subsection 8 the court was nice enough to find for me. The plaintiffs actually did go forward voluntarily and deducted sales of all other products other than the offending and deducted all sales that were made under the limited use license agreement while it was in effect because those were deemed legitimate. Also deducted any book entries between the different reported entities the appellants were pretending to use to prevent any double counting so there were actually significant efforts taken voluntarily although not required by plaintiffs to limit the damages only to those two sales that were stipulated to bid under the marks. In addition with respect to the amount of the damages appellants continually harp on the fact that this is only inequitable simply because of the size it's $11 million dollars out of $17 million dollars plus but it's over 11 years your honor. It's basically on average a million and a half per year and to say that it is not in any way proportionate to the equities of the case is disingenuous at trial we actually asked Judge Herndon to add interest or to enhance the award to take notice of the fact that they had this money in hand. They had to do the use of $17 million for a great portion of 11 years and by only requiring the disgorgement of the actual amounts received out of any interest or any enhancement they actually got the enrichment and get to retain the benefit of having the use of that money for a very substantial period of time so to argue that that is somehow an excessive amount not correlative to the equities ignores the findings of fact by the judge ignores the record and ignores reality. With regard to this argument on the amount of damages did your expert witness take into account the previous rulings of the court when that expert was voluntarily reducing that number in the ways that you described? Not expressly your honor because he was just giving testimony on our burden of putting forth the sales revenues so he did not deduct any costs out but it wasn't because of the rulings it was because it was not sort of his role in the proceedings so it didn't deduct the cost if that's what you're asking but it wasn't directly because of the court's ruling on that matter. And just sort of leading into that a little bit the question about the Greek cross logo. The Greek cross logo was found to be a valid mark if the word mark was in a pre-trial ruling on a motion in limine which was not challenged during the court during the lower court proceedings during the trial so that's another reason why that distinction was never made because it was never brought up during the trial phase. I recognize that under this court's precedent that when an appellant appeals from a final judgment they don't have to specifically notice that they're appealing from preliminary rulings so the fact that they didn't specifically note they were appealing the preliminary ruling on the logo issue did not preclude them from waiving it for that reason here but it wasn't tried and there was no indication that there would be a need to distinguish because it was never raised in the trial level. Turning to the  the appellants do try to challenge it on appeal but they do so by citing the finding of fact of the lower court which specifically found and described the logo and specifically noted that it was not on a white background. They also the case cited in our brief in health organizations specifically dealt with the question of when something distinguishable or not distinguishable from the American Red Cross emblem to fall within the statutory protection and basically indicated that if you read the statute it talks about fraud, it talks about using something in imitation and it basically has been routinely held that if there's distinguishing characteristics then it's not an imitation of and it's basically a side-by-side analysis. In the case cited in our brief it was specifically noted that the salient issue and this is before the USPTO the salient issue before the board is whether Appellant's Mark so resembles the Greek Red Cross that such mark to be said to consist of a matter which may disparage the connection with the Greek Red Cross. It then goes on to say it is apparent from a side-by-side comparison of Appellant's Mark and the symbol cited that Appellant's Mark is readily distinguishable from the Greek Red Cross and found it proper. Again the side-by-side comparison of the emblems in this case show that there is no possibility of confusion, there was no intent, there was no indication that it was ever attempting to be anything connected to the American Red Cross and by the expressed words of the statute it is not in imitation of the Greek Red Cross of the American Red Cross organization. With respect to the question of whether somehow the sales to the distributors who were then reselling in areas outside of the areas that Forcima was acting, we cite in our brief to the case of Siegel v. Geisha in New York City of this court at 517 F3rd 501 which indicates that sales outside the scope of a limited agreement is legally infringement and that is the question as they try to obfuscate this in their briefs in the oral argument just now opposing counsel did recognize that the cases they all cite deal with the question of whether there is an infringement they are not even really damages cases. In the Siegel case, Siegel relies on another opinion of this case Etofka ITOFCA Logistics at 322 F3rd 928 Etofka was a copyright case but Siegel recognized that it applies to trademark and applies it. If you actually look to the Etofka case itself it goes into a lot more detail as to why and how exceeding the scope of a limited license is in itself infringement and ends the inquiry. Specifically stating a licensing infringes the owner's copyright if its use exceeds the scope of its license noting that one who obtains permission to use a copyrighted work may not exceed the specific purpose for which the permission was granted etc. So your honor we do understand that the sales that were made by the manufacturer using Forcimo's retail merchant mark as a manufacturer nationwide ended up with selling to other dealers who were not in the same areas that Forcimo was operating However to allow the law to be read in a way that says that somebody can approach someone who's created a mark that's got value that's showing success in one area, ask permission to use it only for retail sales in one area and then blow it out nationwide is somehow permissible and is not infringement would put the whole purposes of trademark law on its head and moreover even the appellants note that even when looking at whether or not sales in another area are infringement the inquiry is whether or not they're a good faith junior user which here they're not, using in violation of limited use is not good faith and they also recognize, the Supreme Court has recognized that there's no excuse for using marks in another area if that use is inimical to the interest of the senior mark user and clearly fraudulently misleading somebody and violating the use of a limited use agreement and then after acknowledging wrongful use and saying we're going to buy it from you and backing out of that and then rather than stopping use, expanding the use and investing substantially more money is a inimical use. With respect to our motion the appeal of the motion denying Other than conclusion of law 32 which is on appendix 41 the district judge says the case is not deemed exceptional and then within the district judge's conclusion appendix 59, contrary to the assertions, this case is not exceptional. Other than those two paragraphs, is there anything else in the record in which Judge Herndon talks about this exceptional determination? Yes, your honor If any facts and conclusions the law of the court specifically finds that the actions of the appellants were wrongful in bad faith and caused  point of excessive hardship to the defendant and the court And I understand your argument is that he reaches the conclusions that would support a finding of exceptionalism but then I'm talking about reasoning, an exercise of discretion in which he would offer his reasoning weighing, considering that? No, your honor, he didn't. All he did, he made extensive findings of fact all of which would seem to support the opposite conclusion and then just boilerplate said he didn't find it that way without real explanation With respect to the appeal of our motion seeking to impose sanctions against trial counsel, which is different than appellant counsel here today You know, I'm a firm believer there, but for the grace of God, I've been in practice for a long time I've never even brought a motion like this but in this case, from day one, the case was tried on theories that were simply impossible, both factually and legally even to the extent they tried to assert the grown company argument after acquiring a dormant subsidiary nine years later, they didn't even use that subsidiary as a plaintiff It was clearly just an attempt to pressure our client to drop their claims to the remarks that was rightfully theirs and it was just pursued relentlessly, repeatedly at great cost with no real reason or explanation and frankly, your honor, as we say in our brief if this is not a case for the application of that rule, I'm not sure what is Thank you, your honor Thank you, counsel Anything further? This is the May it please your honors My name is Roman Basie, I represent myself as the cross-appellee in this case I would like to make a few comments about the reply brief that was filed by the cross-appellant to my brief as cross-appellee On page 28 of his brief, he makes the statement Basie and his cohorts are preemptive strikers in this case referencing the litigation that was filed I draw the court's attention to the facts of the case The case began with the filing of the trademark application by the cross-appellant by Forcimo That was the preemptive strike in the case That is when my client reached out to me and said Roman, I have a problem They're wanting a logo mark When we looked it up, we found out that they couldn't sell what they were trying to sell to my client That was the preemptive strike in the case Why did we go through this route and look at federal litigation and why did I put the team together I needed to put together to give him the basis for it Because we realized very early on in the trademark opposition and with the shipping wars interference that winning at the USPTO level was not going to resolve our problem Even if we won, we would still have to follow up with federal trademark litigation Once I reached out to the people with the knowledge that had that proper background That is exactly what they informed us They said, Roman, your response to go to the USPTO is fine but you're going to have to follow through with federal trademark infringement or you could have a problem still yet down the road I would like to bring to your attention another section of the reply brief Mr. Kramer makes in his reply brief on behalf of the cross-appellant He's asking the court to change the standard The standard is that if I acted unreasonable or vexatious and this court has defined that term vexatious and unreasonable He adds another word to his complaint now and he says, oh, if Roman acted reasonably if he was reasonably attentive to the case why does he bring the word attentive into his argument It's because he wants to say since I was not the lead counsel at any time since I had put together a team of experts that I believed could handle the case now I must be attentive in the court's eyes to the case Honestly, sitting here today, if that was the situation you would be requiring a managing partner an owner of a company to know exactly every merit of every claim their attorneys were bringing for them I believed I had the right people in place and I believed I gave the right background to that Cross-appellant took very similar action that we took when we strategized our case Our clients realized it didn't matter whether judgment against them was for a million dollars or ten million dollars or a hundred million dollars It was going to bankrupt them either way if they lost the case Counsel with me made a strategic decision to drop claims and let the cross-appellant try to prove their claims at trial court and the cross-appellant says that's part of why we acted unreasonable and why we were vexatious Yet they did the same thing They dropped half of their claims the morning of trial We walked in prepared to defend twelve claims and counsel stands up and drops six claims Exactly the same thing they are arguing that we did that was unreasonable So I don't know where the difference becomes how that wasn't unreasonable but what we did was And finally, while this may be outside the scope of what happened at the trial level If anyone in this courtroom is acting unreasonable or vexatiously It is the cross-appellant's counsel The cross-appellant's counsel has filed two citations to discover assets against two of my companies In Franklin County Court in Illinois One of my companies has absolutely no relationship to the cross-appellant's clients or to the cross-appellant And immediately when that was presented to the court That claim was dropped against that company for that citation to discover assets I thank you very much for your time today Thank you, Mr. Sanders Thank you, Your Honor Since I've only got five I'll get right with it The question I think is what did we know as attorneys when these initial claims were filed Now I came into this case sixteen months after it had been filed So it had been going on a little while But when I agreed to come into the case not take over as lead counsel, simply enter the litigation Here's what we knew. Already They had a dealer, the SISS which is the appellant here had a dealer in Missouri that had been using the name Life-Saver Storm Shelters since February of 2002 That was Exhibit 4 presented at the trial He later incorporated his name using that name and I can't find any case file I know you can't incorporate and use your corporate name as a trademark But if you acquire a trademark first and then incorporate using that name I can't find any case file on it. I've searched and searched But it's possible that he acquired a trademark when he was a sole proprietor eight months before he incorporated He allowed SISS to use that name mark or that name in some of their brochures and literature and then Mr. Grone died in late 2004 SISS dropped the hyphen from the name after he died and beginning in January of 2005 produced their own brochure which was Exhibit 14 presented at trial and clearly states Life-Saver Storm Shelters by Southern Illinois Storm Shelters This was five months before FACIMO ever came on the scene We already knew about the witness that testified at trial, Mr. Carl Breen who had picked one of these brochures up in January of 2005 at a trade show in Louisville, Kentucky Mr. Kramer says in his brief that not every witness gets mentioned in the final order. It's not important, it's not relevant I would point out there were only five live bodies that testified in front of Judge Herndon Three of them were the owners of the corporations that were parties. The fourth one was their expert and the fifth one was Carl Breen He was the only independent third party witness to testify live in that courtroom and he's the only person that's not mentioned nor is this exhibit mentioned He was the most damaging witness and the most damaging exhibit to FACIMO's case and they just ignored him like they don't exist Now what we also knew, or what I knew when I came on board at that time was that FACIMO had a counterclaim, an amended counterclaim and a second amended counterclaim on file They had an application with the USPTO on file and they had a response to them telling them they can't use the Red Cross on file all before I came on board and not a single one of those pleadings or applications ever suggested that they had used this name mark prior to becoming a dealer Everything centered around the period from May of 2005 to January 1st 2006 So did we have a rational basis when we filed this or when I came on board given that all the evidence that we had even at that time clearly showed that that name had been used for at least three years before FACIMO came on the scene with a hyphen and had been used for five months without the hyphen before FACIMO was ever in the picture? Did we have a rational basis for believing that whatever rights it may attach to that name belong to us? Absolutely we did. There was nothing irrational about that whatsoever. And if you look at the brochures that they began producing they used the name that we were using they used the language from our other they used our pictures. All they did was rearrange it and stick a red cross on it. We didn't have an objection to that, but we had no clue that they were trying to lay claim to that name until we found out that they had filed something with the USPTO So we never denied that they were creators of the logo. It turned out the logo was illegal So we had every reason to file this lawsuit in the first place. It's not a preemptive strike. It was, had I been in charge at the time, I might have filed it as a defection, but I'm not sure it would have changed the outcome here one bit. So there's no basis. The judge was absolutely correct in denying the sanctions and this court should affirm that denial I think. Thank you very much Mr. Gerlach May it please the court Your Honor, as trial counsel indicated, our client has never claimed ownership of the Red Cross logo. They thought that that was an interesting way to market and sell the products through the distributors and through Forsemo being one of them. And they allowed them to do it and they agreed to go ahead and let's go ahead and use it. So when they entered into these various agreements that were talked about later, those agreements were based upon the logo and not the wordmark It was never recognized that the wordmark was owned by Forsemo. It was always recognized or understood by our clients that it was owned by SISS As indicated, there's evidence on the record to show that the wordmark was used by a distributor of SISS prior to Forsemo even claiming that it had adopted and created the mark So that was a confusion between the parties as to which mark they were talking about but that was never the understanding of our client with regard to the license agreement or any other subsequent understanding. I remain interested in the allocation of burdens of proof and persuasion We've now talked briefly about section 117A What effect do you think that has in this case given that your client did not make any effort to separate the effects of either the Greek cross from the language or the trademark from other sources of revenue Yes, Your Honor. 1117A and B are the damages provisions of the Lanham Act and they talk about the burden of proof with regard to damages It says all the plaintiff has to do is show the defendant's sales. The defendant has to show everything else Doesn't that suggest that the burden is on the defendant with respect to the questions I was asking? But to reach 1117A or B, you have to first prove infringement I understand that The whole point of discussing damages is to ask what happens if infringement is shown Correct Do you have any response to the somewhat belated invocation of section 117A? Yes, Your Honor You're asking whether or not there's some way and where the burden falls with regard to the plaintiff and the defendants with regard to a distinction of the logo and the word mark with regard to damages Again, I go back to the fact that there has to be a proof of infringement. There's no proof of infringement You have to be able, in a legal case to talk about the merits and damages separately Put the merits to one side Do you have any response with respect to how 117A applies to damages? Well, if the damages are being addressed associated with the word mark then the application is clear the damages can be assessed based upon the sales and then there's a set off burden that's put upon the defendant The problem here is that you've got two marks one of which, well, setting aside the entire ownership issue but we have another mark which is illegal, not to be used and that mark is being put together in the same damages category when there's no infringement with the damage assessment determination for the word mark. There is no clarity between the two The damages have to be attributed to infringement. And so the damages in this case were attributed to both marks, not just one. It's not a burden for us The burden attributable under 1117A has to do with once the infringement has been established Is there some case I could go and look at for that proposition? I'm not aware of any such case other than the case law which reiterates what I was just mentioning, Your Honor that the burden Nothing in the McCarthy Treatise No, it's not in the McCarthy Treatise Oh dear Even one of the cases cited by  Even one of the cases cited by Forsima, which is Mishikawa states clearly the starting point of the case before is the response infringement of the trademarking violation of the Federal Act. So you have to look at the infringement before you even get to the question of the damages That's pretty clear We look at Badger Meter Thank you The case is taken under advisement I'm sorry? The case is taken under advisement I'm sorry, I'm out of time. I apologize, Your Honor Thank you